IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 5, 2003

## STATE OF TENNESSEE v. ANDRE ANTHONY

**Direct Appeal from the Criminal Court for Shelby County**
**No. 00-00157-61      Chris Craft, Judge**

---

**No. W2002-01377-CCA-R3-CD  - Filed December 30, 2003**

---

Following a jury trial, Defendant, Andre Anthony,  was convicted of two counts of forgery over five hundred dollars, one count of forgery over one thousand dollars, one count of criminal attempt to commit first degree murder, and one count of especially aggravated robbery.  In his appeal, Defendant argues that (1)  the evidence was insufficient to find him guilty beyond a reasonable doubt of attempt to commit first degree murder and especially aggravated robbery; (2) the trial court erred in denying Defendant's motion to suppress evidence obtained through an inventory search of Defendant's vehicle; (3) the trial court erred in failing to instruct the jury that "serious bodily injury" is an element of the offense of especially aggravated robbery; and (4) the trial court erred in ordering Defendant's sentences for attempt to commit first degree murder and especially aggravated robbery to be served consecutively.  After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Scott Hall, Memphis, Tennessee, for the appellant, Andre Anthony.

Paul G. Summers, Attorney General and Reporter; Thomas E. Williams, III, Assistant Attorney General; William L. Gibbons, District Attorney General; Steve Jones, Assistant District Attorney; and Amy Weirich, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The victim, Jack Scott, was working alone in his store on July 16, 1999.  Shortly before closing, a man entered the store.  Mr. Scott recognized the man because he had visited the store about a week earlier.  On the first visit, the man and Mr. Scott had a lengthy discussion about two water fountains in which the man had expressed an interest in purchasing.  The two men continued this discussion on July 16 during the man's second visit to the store.  After a few minutes, Mr. Scott

offered to reduce the price of the "trout lily" fountain by twenty dollars and began filling out a sales receipt. The man suddenly pulled out a handgun and demanded Mr. Scott's wallet. After Mr. Scott gave the man his wallet, he struck Mr. Scott with the fist that held the gun and then began to repeatedly kick and choke him. During the attack, the man kept asking Mr. Scott to repeat the personal identification number for his ATM card. He told Mr. Scott that he would come back and kill him if the number was incorrect. Eventually, the man dragged Mr. Scott into the bathroom by his shirt. Mr. Scott tried to close the bathroom door with his foot, but the man came into the bathroom, kicked Mr. Scott again, and asked him to repeat his PIN. Mr. Scott heard the man rummaging around the store and pulling out drawers. The attack lasted about fifteen or twenty minutes.

After the man left, Mr. Scott waited five minutes and then crawled to the counter and pushed the alarm button. He then half-crawled, half-stumbled to a nearby business and summoned an ambulance and the police.

At trial, Mr. Scott identified Defendant as the man who attacked him. Mr. Scott testified that as a result of the attack, two of his ribs were broken, three teeth were knocked out, his left ear was detached, and he needed over eighty stitches to repair the injuries to his face. He lost twenty pints of blood and was on a respirator for six days because of a collapsed lung.

Mr. Scott said that Defendant removed the cash from the cash drawer while he was in the store. Six credit cards and three blank checks that had been in his attache case were also missing as well as the "trout lily" water fountain. After the attack, Mr. Scott attempted to close his credit card accounts but one account was inadvertently left open. On August 24, his bank called and said that someone had tried to use Mr. Scott's credit card on the open account.

Also on August 24, Lieutenant Joe Scott, a sergeant with the Memphis Police Department at the time of the offense, and also not related to the victim, brought Mr. Scott a photographic line-up consisting of six pictures. Mr. Scott said that Lieutenant Scott told him that a suspect had been arrested in his case but did not tell him the suspect's name or where he had been arrested. Mr. Scott immediately identified Defendant as his assailant from the photographs. Mr. Scott said that Lieutenant Scott gave him an extra copy of the photographic lineup when he left. Mr. Scott kept the copy in his personal file pertaining to the offense and admitted that he had the copy of the lineup with him at the preliminary hearing when he again identified Defendant as his assailant. Mr. Scott, however, denied that he looked at his copy of the lineup prior to this identification in court.

On cross-examination, Mr. Scott said that he did not remember if Defendant had a tattoo at the time of the attack. Mr. Scott explained at trial that although he had previously described Defendant as clean-shaven, Defendant had a "dark growth" of beard at the time of the offense. Mr. Scott said that he suffered from double vision in his left eye at the time he made an identification from the photographic lineup, but his vision in that eye was not blurred. When he looked at something, Mr. Scott explained, the images were initially clear. In a few minutes, however, the images would separate so that he saw two rather than one image. Mr. Scott said he wore his reading

glasses during the identification process. Mr. Scott said that Defendant did not fire his gun during the attack, and that he did not attempt to resist Defendant's attack.

Sergeant A. J. Kant testified that Lieutenant Scott asked him to return to the victim's store the day after the offense. Some pieces of evidence had been overlooked during the initial search including some fragments from a pistol's grip. Sergeant Kant said that no prints were recovered at the scene or on the gun pieces.

Chaundrea Sains and her son were living with Defendant at the time of the offense. She said that Defendant owed her stepfather around $7,000 and apparently had not been making rent payments on the couple's house although Ms. Sains gave Defendant her share of the rent each month. Ms. Sains said that she owned a Nissan Altima and that Defendant usually drove her to work because his car was broken. She assumed therefore that Defendant was driving her car on July 16.

A couple of days after July 16, Defendant's mother told Ms. Sains that she had heard a broadcast that the police were looking for a gold Altima driven by a black male. Ms. Sains relayed that information to Defendant and told him to be careful. She said she did not think that Defendant had done anything wrong, but she was concerned for his safety because he drove an Altima.

Defendant left the couple's home a few days later. He told Ms. Sains over the telephone that he was in rehabilitation and could not be visited by his family. Ms. Sains said Defendant called every other day, and she saw him briefly on two occasions. During one call, Ms. Sains heard a baby crying in the background, and Defendant explained that he was in Arkansas visiting his son. Ms. Sains said that she did not believe Defendant was in rehabilitation but felt that he just needed some time apart. She denied that she and Defendant were having problems at the time of the offense.

Ms. Sains said that Defendant always wore a beard like the one he had at the trial and that Defendant had a tattoo on his leg. She also thought Defendant had a tattoo on his arm, but the tattoo Defendant had on his arm at trial was not like the tattoo he had before. Ms. Sains said that she never saw the "trout lily" water fountain.

Jeff Tow, an officer with the Memphis Police Department, responded to a report from a Powertel employee that someone was attempting to use a stolen credit card to make a purchase. When he arrived, one of the employees pointed at Defendant who was at a sales counter filling out a service contract. Officer Tow noticed that the contract was in the name of "Jack Scott" and asked Defendant his name. Defendant told Officer Tow his name and said that the credit card belonged to his uncle. Officer Tow handcuffed Defendant and asked for his identification. Defendant told him his wallet was in his car. Officer Tow escorted Defendant to the squad car and ran the name "Jack Scott" through the computers while another officer searched Defendant's car for his wallet. Defendant was in the back seat of the police car when the information that the credit card had been taken in a robbery came over Officer Tow's radio. Defendant told Officer Tow that he had found the credit card.

3

Marquis Collier, a patrol officer, arrived at the scene after Defendant was arrested and inventoried Defendant's car prior to its impoundment. Officer Collier found three checks on Mr. Scott's bank account made out to Defendant and signed "Jack Scott" as payor. The first check was in the amount of $600.00 and dated July 16, 1999. The second check was in the amount of $1,200.00 and dated August 19, 1999. The third check, also dated July 16, 1999, was in the amount of $600.00. Although the inventory revealed various personal items and recently purchased merchandise, the trial court only admitted into evidence, in addition to the three checks, the victim's credit cards and driver's license, a scrap of a CitiBank form with Mr. Scott's address and telephone numbers, a scrap of paper containing the same information, and a receipt from Best Buy dated August 24, 1999 with Mr. Scott's name listed as the cardholder.

Officer William Merritt interviewed Defendant after his arrival at the police department. Defendant waived his Miranda rights but refused to give a written statement at the conclusion of the interview. In his oral interview, Defendant said that he was trying to buy a cell phone in Mr. Scott's name at Powertel. He said, however, that he had found Mr. Scott's wallet at either the end of May or the first of June in a parking lot. Defendant told Officer Merritt that he did not make any purchases with Mr. Scott's credit cards for a couple of weeks, and then he began buying items in Memphis and Arkansas which were later pawned for cash. Officer Merritt told Defendant that the credit cards were not stolen until July 16, and Defendant responded that maybe he was mistaken as to when he found the wallet. Defendant said that he just filled in the dates on Mr. Scott's checks randomly.

Lieutenant Scott was assigned to the case the day after the offense. When he and the victim's step-son toured the victim's store, Lieutenant Scott discovered that some broken pieces from a pistol's grip and a disabled telephone had been overlooked during the initial search.

Lieutenant Scott interviewed Mr. Scott on July 17. Mr. Scott was heavily sedated and could only describe his assailant as a black male. Mr. Scott also said that the assailant had taken the "trout lily" water fountain. On August 24, Lieutenant Scott took a photographic lineup to Mr. Scott's house. Lieutenant Scott said that he did not tell the victim that a suspect had been arrested until after Mr. Scott identified Defendant as his assailant. Lieutenant Scott said that Mr. Scott started to cry when he saw the photographs and then pointed to Defendant's picture. Because Mr. Scott was so upset, Lieutenant Scott at that point told him that Defendant was in custody. Lieutenant Scott said that if he left a copy of the lineup with Mr. Scott it was by mistake.

Thomas Vastrick, a forensic document examiner, compared Defendant's handwriting samples with the handwriting on the Powertel service agreement and one of the checks. Mr. Vastrick testified that the writer of the samples also filled out the other documents.

The defense called Edna Anthony, Defendant's mother, who said that Defendant had a tattoo on his arm prior to July 1999. On cross-examination, Ms. Anthony said that Defendant never told her he was in rehabilitation. She said that Defendant accompanied her to Arkansas in August but did not buy anything with a credit card.

4

On the basis of this evidence, the jury found Defendant guilty of the charged offenses.

At the sentencing hearing, Mr. Scott testified that he had been forced to close the store on Oak Haven Road because the injuries from the attack left him unable to manage the business. Mr. Scott said he has to wear a hearing aid and is still undergoing dental work. His medical bills approached $80,000.

Coulette Johnson, Defendant's cousin, and Saundra Falkner and Neal Eason, friends of Ms. Anthony, all testified that they could not believe that Defendant would commit a violent crime. All of the witnesses said that Defendant was not a violent person, and Ms. Johnson pointed out that none of Defendant's prior offenses involved violence. Ms. Anthony, Defendant's mother, said that Defendant still maintained he was innocent of the attack and was guilty only of possessing Mr. Scott's checks and credit cards.

At the conclusion of the hearing, the trial court sentenced Defendant to twenty-four years for the conviction of attempted first degree murder, twenty-two years for the especially aggravated robbery offense, four years on the Class D felony forgery offense and two years on each of the Class E felony forgery offenses. The trial court ordered Defendant to serve the sentences for the forgery convictions concurrently with his convictions for attempted first degree murder and especially aggravated robbery. Based on a finding that Defendant was a dangerous offender, the trial court ordered Defendant to serve his sentence for especially aggravated robbery consecutively to his sentence for attempt to commit first degree murder.

**Sufficiency of the Evidence**

Defendant argues that the evidence was insufficient to support a conviction for attempt to commit first degree murder because the State failed to prove beyond a reasonable doubt that Defendant acted either with premeditation or with the specific intent to kill Mr. Scott. Defendant submits that his intent during the offense was to rob, not kill, Mr. Scott. Defendant argues that Mr. Scott's testimony supports his position that he only struck Mr. Scott in order to get his PIN. Moreover, Defendant did not beat Mr. Scott continually during the robbery, Mr. Scott never lost consciousness and Defendant did not fire his handgun. Defendant knew that Mr. Scott was alive when he left the store because he told Mr. Scott he would come back to the store and kill him if the PIN turned out to be incorrect.

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S.307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.; State*

5

*v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

Criminal attempt is committed when a person, "acting with the kind of culpability otherwise required for the offense: (1) [i]ntentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be; (2) [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or (3) [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a).

At the time of the offense, first degree murder was defined as "a premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally with respect to . . . a result of the conduct when it is the person's conscious objective or desire to . . . cause the result." *Id.* -13-302(a). A premeditated act is one "done after the exercise of reflection and judgment." *Id.* -13-202(d). "'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." *Id.*

Because there is rarely direct evidence as to the state of a defendant's mind at the time of an offense, it is proper to infer intent and premeditation from the circumstances surrounding the attack. *State v. Lowery*, 667 S.W.2d 52, 57 (Tenn. 1984); *State v. Inlow*, 52 S.W.3d 101, 105 (Tenn. Crim. App. 2000); *State v. Lewis*, 36 S.W.3d 88 (Tenn. Crim. App. 2000). Defendant contends that his threat to return to the store to kill Mr. Scott if the information proved incorrect goes against a finding that he intended to kill Mr. Scott at the time of the offense. A defendant's declaration of his stated purpose for initiating the offense, however, is but one factor in determining whether the defendant acted with the requisite mental culpability. *State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993). An intent to kill may be inferred from the brutality of the attack or the infliction of repeated blows upon the victim. *State v. Banks*, 564 S.W.2d 947, 950 (Tenn. 1978).

Defendant first visited the store a week before the attack. He conversed with Mr. Scott at length about the various water fountains for sale in Mr. Scott's store. Defendant entered the store a second time under the same pretense of purchasing a water fountain. Mr. Scott was alone in the store and unarmed. When Defendant pulled out a gun and demanded his wallet, Mr. Scott cooperated. Without provocation, Defendant then began to kick, choke and repeatedly hit Mr. Scott more than a dozen times. He drug Mr. Scott into the bathroom by his shirt, rummaged through the counter drawers, then returned to kick Mr. Scott again.

6

The use of a deadly weapon on an unarmed victim, the infliction of multiple wounds, the resumption of the attack after the victim is incapacitated, and a declaration of an intent to kill if the victim does not cooperate are factors which support the existence of a premeditated killing. State v. Bush, 942 S.W.2d 489, 502 (Tenn. 1997); *Lewis*, 36 S.W.3d at 96 (citations omitted). In the light most favorable to the State, we conclude that a rational trier of fact could have found the elements of premeditation and intent based on the evidence presented. Defendant is not entitled to relief on this issue.

Defendant also challenges the sufficiency of the evidence supporting his conviction for especially aggravated robbery. Defendant submits that a reasonable trier of fact could not conclude that Mr. Scott suffered serious bodily injury because the State did not offer any medical testimony to corroborate Mr. Scott's testimony as to the nature and extent of his injuries. Defendant cites no authority in support of his argument, and we find no merit in Defendant's contention.

"Serious bodily injury" involves bodily injury where there is (A) [a] substantial risk of death; (B) [p]rotracted unconsciousness; (C) [e]xtreme physical pain; (D) [p]rotracted or obvious disfigurement; or [p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty. Tenn. Code Ann. § 39-11-106. Whether a victim has suffered serious bodily injury sufficient to elevate the offense to especially aggravated robbery is generally a question of fact for the jury. *See State v. Barnes*, 954 S.W.2d 760, 765-66 (Tenn. Crim. App. 1997).

Mr. Scott testified that the injuries resulting from the blows to his head required eighty stitches and surgery on his eye. His left ear was detached leaving him with a permanent hearing impairment. Mr. Scott lost twenty pints of blood and spent six days in the intensive care unit. Based on these injuries, a reasonable trier of fact could conclude that Mr. Scott suffered serious bodily injury. The combination of his injuries demonstrates a substantial risk of death while Mr. Scott's hearing difficulties are attributable to the impairment of a bodily organ. Accordingly, the evidence was sufficient to sustain Defendant's conviction of especially aggravated robbery. *See State v. McPeak*, No. W2001-00764-CCA-R3-CD, 2002 WL 1482792 (Tenn. Crim. App. at Jackson, Feb. 14, 2002) (Victim's testimony concerning the injuries he received during the robbery, including the number of blows to his head and a resultant permanent hearing impairment sufficient to support a finding of serious bodily injury).

Finally, Defendant argues that the evidence was not sufficient to support a conviction because Mr. Scott's identification of Defendant as the perpetrator was unreliable. Mr. Scott did not identify Defendant until August 24, he suffered from blurred vision at the time, and there was conflicting testimony as to the extent of Defendant's beard at the time of the offense.

As previously noted, the weight and credibility of a witness's testimony is left exclusively to the trier of fact. *Bland*, 958 S.W.2d at 659. "It is well established that the identification of a defendant as the person who committed the offense for which he is on trial is a question of fact for the determination of the jury upon consideration of all competent proof." *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993), citing *State v. Crawford*, 635 S.W.2d 704, 705, (Tenn.

7

Crim. App. 1982). The victim's testimony, "by itself, is sufficient to support a conviction." *Id.*, citing *State v. Williams*, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981).

Mr. Scott had two opportunities to observe Defendant at length prior to the physical attack. His conversations with Defendant on these occasions involved a routine customer inquiry in a well lit store. When shown the photographic lineup prepared by Lieutenant Scott, Mr. Scott immediately identified Defendant. He also identified Defendant at the preliminary hearing and again at trial. Although there was conflicting testimony as to the extent of Defendant's facial hair or whether he had a tattoo at the time of the offense, inconsistencies or inaccuracy in the description of a defendant by a victim who is otherwise able to positively identify the defendant as the perpetrator are questions for the jury to consider in determining the weight of the testimony. *State v. Radley*, 29 S.W.2d 532, 537 (Tenn. Crim. App. 1999). Although inaccuracies may impact the victim's credibility as a witness, "the jury's verdict will not be disturbed unless the inaccuracies or inconsistencies are so improbable or unsatisfactory as to create a reasonable doubt of the [defendant's] guilt." *Id.* Mr. Scott viewed Defendant under circumstances that would permit a positive identification. Conflicting testimony concerning whether Defendant had a beard or tattoo at the time of the offense do not render Mr. Scott's testimony so improbable or unsatisfactory as to create a reasonable doubt as to Defendant's guilt. Defendant is not entitled to relief on this issue.

**Motion to Suppress**

Defendant argues that the trial court erred in denying his motion to suppress the evidence obtained by the police during a search of Defendant's vehicle at the time of his arrest on August 24. Relying on *State v. Lunsford*, 655 S.W.2d 921 (Tenn. 1983) and *Drinkard v. State*, 584 S.W.2d 650 (Tenn. 1979), Defendant contends that the impoundment and inventory search of Defendant's vehicle was unlawful. Defendant argues that he did not consent to the search, that his car was parked in a legal and unobstructed spot, and that the officers did not ask him if he could arrange to have his car moved.

The State contends that the victim's checks and credit cards which were in Defendant's wallet were not discovered during the inventory search but with Defendant's consent. As to the other pieces of evidence found in the trunk of Defendant's vehicle, the State argues that the police officers had probable cause pursuant to *State v. Leveye*, 796 S.W.2d 948 (Tenn. 1990) to search Defendant's vehicle regardless of whether or not the impoundment was reasonable.

At the suppression hearing, Officer Tow testified that the store employees identified Defendant as the person who was attempting to purchase a cell phone with a stolen credit card. Officer Tow handcuffed Defendant and initially arrested him for forgery. He asked Defendant for his identification, and Defendant replied that it was in his car. Officer Tow searched Defendant for weapons and found a set of keys which Defendant confirmed were his car keys. Officer Tow then placed Defendant in the squad car.

8

Officer David Ayers said that Defendant told the police officers at the scene that his identification was in his wallet under the driver's seat of his car. Following Defendant's directions, Officer Ayers found the wallet containing the victim's checks and credit cards. Officer Ayers testified that it was normal administrative procedure to impound and inventory an individual's vehicle when the individual was arrested for a serious crime. The police officers discovered various merchandise, sales receipts and pawn tickets when the vehicle's trunk was inventoried.

Officer Tow said that Defendant's car was located on the second level of the strip mall's parking lot in front of a vacant business. On cross-examination, Officer Tow said that he did not speak with the owners of the parking lot to ascertain whether Defendant's vehicle could remain on the lot. Officer Ayers said there were no exigent circumstances present, and he was not aware if anyone had obtained a search warrant prior to searching Defendant's vehicle. Both officers said that Defendant did not verbally consent to the search of his wallet.

At the conclusion of the testimony, the trial court observed that the search involved two separate classes of property, the wallet and the merchandise found in the trunk. Based on the circumstances surrounding Defendant's arrest, the trial court found that Defendant impliedly consented to the search of his wallet. The trial court also found that Defendant's vehicle was parked in a public parking lot, and Defendant was not accompanied by anyone who could remove the vehicle from the lot. Accordingly, the trial court concluded that the impoundment and subsequent inventory search of Defendant's vehicle was proper. Moreover, the trial court found that because the impoundment of Defendant's vehicle was lawful, the wallet would have been inevitably discovered during the inventory search. The trial court denied Defendant's motion to suppress the victim's checks and credit cards discovered in his wallet and the items found in the trunk of his car.

A trial court's findings of fact in a suppression hearing are binding upon this court unless the evidence contained in the record preponderates against them. *State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence and resolve any conflicts in the evidence. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). However, this court is not bound by the trial court's conclusions of law. *State v. Simpson*, 968 S.W.2d 776, 779 (Tenn. 1998). The application of the law to the facts found by the trial court are questions of law that this court reviews *de novo*. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000). The defendant has the burden of establishing that the evidence contained in the record preponderates against the findings of fact made by the trial court. *Braziel v. State*, 529 S.W.2d 501, 506 (Tenn. Crim. App. 1975).

We begin our analysis with the proposition that a warrantless search and seizure is *per se* unreasonable under the Fourth Amendment unless the search falls into one of certain specifically delineated exceptions. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043, 36 L. Ed. 2d 854 (1973) (citations omitted). These exceptions include searches incident to a lawful arrest, consensual searches, searches incident to the 'hot pursuit' of a fleeing criminal, 'stop and frisk'

searches, and searches based on probable cause under exigent circumstances. *State v. McMahan*, 650 S.W.2d 383, 386 (Tenn. Crim. App. 1983), citing *State v. Shaw*, 603 S.W.2d 741, 742 (Tenn. Crim. App. 1980).

Police officers may also conduct a warrantless inventory search of a lawfully impounded vehicle even in the absence of probable cause that the vehicle contains evidence subject to seizure or exigent circumstances. *State v. Watkins,* 827 S.W.2d 293, 295 (Tenn. 1992), citing *South Dakota v. Opperman*, 428 U.S.364, 372, 96 S. Ct. 3092, 3098-99, 49 L. Ed. 2d 1000, 1007 (1976); *State v. Glenn*, 649 S.W.2d 584, 588 (Tenn. 1983). The inventory search exception, however, does not give "a police officer carte blanche to impound and inventory the contents of an arrested person's car." *Watkins*, 827 S.W.2d at 295. As Defendant argues, the validity of an inventory search depends upon whether it was reasonably necessary to impound the arrested person's vehicle. *See Lunsford,* 655 S.W.2d at 923; *Drinkard*, 584 S.W.2d at 654.

The State argues that Defendant consented to the search of his wallet regardless of whether the impoundment of Defendant's vehicle was reasonable. We agree with the State that the characterization of the search as an inventory search by Officers Tow and Ayers is not controlling as to the type of search conducted. *Watkins*, 827 S.W.2d at 296. Based on the facts presented at the suppression hearing, however, we cannot conclude, as the trial court did, that Defendant unequivocally consented to the search of his wallet.

Officer Tow placed Defendant in handcuffs and patted him down for a weapon. During the process, he asked Defendant for his identification. Defendant told Officer Tow his wallet was in his car under the driver's seat. From these facts, the trial court concluded that Defendant, through his actions, implied "that [the wallet is] there, go get it, you can see it for yourself."

A search conducted pursuant to an individual's consent is one of the exceptions to the warrant requirement. *State v. Troxel*, 78 S.W.3d 866, 871 (Tenn. 2002), citing *Schneckloth*, 412 U.S. at 248, 93 S. Ct. at 2059. The consent to a search, however, must be "unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *State v. Simpson*, 968 S.W.2d 776, 784 (Tenn. 1998) (quoting *State v. Brown*, 836 S.W.2d 530, 547 (Tenn. 1992)). The State bears the burden of showing that a consent to a warrantless search was freely and voluntarily given based on the totality of the circumstances. *McCary*, 45 S.W.3d at 43, citing *Schneckloth*, 412 U.S. at 227, 248-249, 93 S. Ct. at 2047-48; *State v. Ashworth*, 3 S.W.3d 25, 28-9 (Tenn. Crim. App. 1999). The State's burden, however, "cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 548-49, 88 S. Ct. 1788, 1792, 20 L. Ed. 2d 797 (1968); *State v. Clark*, 844 S.W.2d 597, 599 (Tenn. 1992) (Stepping back from a doorway when the police officers entered a residence does not imply a consent to search the premises).

Defendant was handcuffed and in the midst of a pat down when Officer Tow asked him for his identification. Defendant replied that his wallet was in his car. Defendant was then placed in the police car while another officer went to Defendant's vehicle to search the driver's seat for his

wallet. An unequivocal and voluntary consent to search "will not be lightly inferred." *Clark*, 844 S.W.2d at 599. Based on the circumstances presented here, we cannot conclude that Defendant consented to the search of his car.

Our analysis does not stop here, however. We note that throughout their arguments, the parties analyze the basis for the search of Defendant's wallet and the search of his vehicle under different theories. We believe, however, that *Leveye* is applicable to the evidence found in the interior as well as the trunk of Defendant's vehicle. Based on the circumstances surrounding Defendant's arrest and the search of his car, we conclude that the police officers had probable cause to search Defendant's vehicle. This search lawfully extended to all parts of the vehicle, including the passenger compartment and the trunk, and all unopened articles found in the vehicle, including Defendant's wallet. *United States v. Ross*, 456 U.S. 798, 821, 102 S. Ct. 2157, 2171, 72 L. Ed. 2d 572 (1982).

In *Leveye*, a burglary victim identified the property carried by the defendant as hers. A pat-down of the defendant revealed other property belonging to the victim. The defendant's vehicle was parked a short distance away in a public parking area. In upholding the warrantless search of the defendant's vehicle, our supreme court followed *California v. Carney*, 471 U.S. 386, 105 S. Ct. 2066, 85 L. Ed. 2d 406 (1985) in concluding that the inherent mobility of a vehicle creates a conclusive presumption of exigency. *Leveye*, 796 S.W.2d at 952. Thus, the court found that a warrantless search of a vehicle parked in a public place in the aftermath of a crime is valid if the police have probable cause to believe that the vehicle contains items subject to seizure. *Id.*

Defendant was arrested while in the process of attempting to use a stolen credit card to purchase a cell phone. He had no identification other than that belonging to the victim, and his vehicle was parked a short distance away in a public parking lot. Probable cause is based on a "reasonable ground for suspicion, supported by circumstances indicative of an illegal act." *State v. Henning*, 975 S.W.2d 290, 294 (Tenn. 1998). If the police have probable cause to believe that Defendant's vehicle contained other contraband or evidence subject to seizure, they may either seize the vehicle and then obtain a warrant or they may search the vehicle immediately. *Chambers v. Maroney*, 399 U.S. 42, 52, 90 S. Ct. 1975, 1981 (1970). The scope of a warrantless search is the same as that which could be authorized by a warrant. *Ross*, 456 U.S. at 825, 102 S. Ct. at 2172. If the police have probable cause to search a lawfully parked vehicle, the search extends to all parts of the vehicle and any articles or containers in which the objects of the search may be concealed. *Id.*

Defendant was apprehended during the commission of a crime with the victim's property in his possession. Based upon the facts and circumstances surrounding Defendant's arrest, we conclude that the police officers had probable cause to believe that Defendant's vehicle contained other property belonging to the victim. Both the items in Defendant's trunk and the victim's credit cards and checks were properly discovered during a probable cause search of Defendant's vehicle following his arrest. Defendant is not entitled to relief on this issue.

11

**Improper Jury Instruction**

Defendant argues that the trial court erred in not providing the jury with a complete instruction on the elements of aggravated robbery as a lesser-included offense of especially aggravated robbery. In its instructions, the trial court elided certain portions of the statutory definition of "aggravated robbery" and defined "aggravated robbery" as a robbery committed with a deadly weapon. The proof of either one of two alternative elements, however, may support a conviction of the offense of aggravated robbery. Tenn. Code Ann. § 39-13-402(a)(1)-(2). A defendant may commit aggravated robbery by either (1) using a deadly weapon or by displaying an article used or fashioned to lead the victim to reasonably believe the article is a deadly weapon; or (2) causing serious bodily injury to the victim. *Id.*

The instructions submitted to the jury defined "aggravated robbery" as follows:

Any person who commits the offense of aggravated robbery is guilty of a crime.

For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements;

(1) that the defendant knowingly obtained property owned by Jack Scott;
and
(2) that the defendant did not have the owner's effective consent;
and
(3) that the defendant intended to deprive the owner of the property;
and
(4) that the defendant took such property from Jack Scott by the use of violence;
and
(5) that the defendant took such property intentionally or knowingly;
and
(6) that the defendant accomplished this act with a deadly weapon.

The trial court omitted the second element based on serious bodily injury in its entirety from its definition of "aggravated robbery" and deleted from the first element that the robbery may also be committed by an article fashioned to make the victim believe the perpetrator has a deadly weapon. The State argues that even if the trial court erred in not providing a complete instruction on the offense of aggravated robbery, the error was harmless.

Although not addressed by the parties in their briefs, we note initially that Tennessee Code Annotated § 40-18-110 was amended by the legislature in 2001 to provide that a party's request for an instruction as to the law of a particular lesser-included offense must be submitted in writing prior to the trial court's charge to the jury. Tenn. Code Ann. § 40-18-110(a). Failure to submit a written

request results in a waiver of the instruction and will not present a ground for relief in either a motion for a new trial or on appeal. *Id.* -115 (c).

If a written request is not submitted, the trial court may charge the jury on a particular lesser-included offense, but no party is entitled to such an instruction. *Id.* -110(b). If a written request for an instruction as to a lesser-included offense is submitted, the trial court must first make a determination that the record contains evidence that reasonable minds could accept as to the lesser-included offense. *Id.* -110(a). In so doing, the trial court must view the evidence "in the light most favorable to the existence of the lesser included offense without making any judgment as to the credibility of such evidence" and determine whether the evidence "is legally sufficient to support a conviction of the lesser-included offense." *Id.*

The 2001 amendments to Tennessee Code Annotated section 40-18-110 were effective to all trials conducted on or after January 1, 2002, and Defendant's trial took place in February, 2002. The content of the trial court's instructions on aggravated robbery and robbery as lesser-included offenses of the charged offense of especially aggravated robbery was discussed at length during a hearing outside the presence of the jury. It does not appear, however, from the record that Defendant submitted a written request for instructions prior to the trial court's charge to the jury. Nonetheless, we cannot read section 40-18-110 to preclude challenges, upon proper objection, to the content of a trial court's instructions as to a lesser-included offense provided to the jury regardless of whether the defendant filed a written request for the instruction or not. *See* Tenn. Code Ann. 40-18-110(d). Accordingly, we will address the merits of Defendant's issues concerning the contents of the trial court's instruction to the jury regarding the lesser-included offense of aggravated robbery.

Aggravated robbery is clearly a lesser-included offense of especially aggravated robbery under part (a) of the *Burns* test because all of the elements of aggravated robbery, regardless of the theory offered to support the conviction, are elements of especially aggravated robbery. *State v. Locke*, 90 S.W.3d 663, 673 (Tenn. 2002); *State v. Burns*, 6 S.W.3d 453, 466-67 (Tenn. 1999). Based on the evidence presented, the trial court found that no reasonable jury would conclude that a gun was not used in the commission of this robbery. The trial court concluded that if the jury found that the victim suffered serious bodily injury, the evidence would support only a conviction of especially aggravated robbery since the use of a gun was, in the trial court's opinion, uncontroverted. If the jury did not find that the victim suffered serious bodily injury, then the jury could only conclude that Defendant was guilty of aggravated robbery based upon the use of a deadly weapon.

Before submitting its written instructions to the jury, the trial court gave what can best be described as "pre-jury charge" instructions that were not reduced to writing and comprised approximately seven pages of transcript. The trial court informed the jury that "[i]f you find [Defendant] not guilty of [especially aggravated robbery] or have a reasonable doubt as to his guilt of that offense, then you're going to go down and decide [a]ggravated [r]obbery. It's exactly the same as [e]specially [a]ggravated [r]obbery except without the element of alleged victim suffered bodily injury. That's not in there."

13

In Tennessee, the constitutional right to trial by jury encompasses the right to have all factual issues determined by twelve jurors. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000), citing *State v. Bobo*, 814 S.W.2d 353, 356 (Tenn. 1991); *Willard v. State*, 174 Tenn. 642, 130 S.W.2d 99 (Tenn. 1939). The trial court thus has the duty to provide a complete and accurate charge to the jury. *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990); *State v. Page*, 81 S.W.3d 781, 789 (Tenn. Crim. App. 2002); *State v. Walker*, 29 S.W.3d 885, 893 (Tenn. Crim. App. 1999); *State v. Stoddard*, 909 S.W.2d 454, 460 (Tenn. Crim. App. 1994). Factual issues concerning an element of the offense are reserved to the trier of fact. *State v. Burrows*, 769 S.W.2d 510, 513 (Tenn. Crim. App. 1989).

By determining that a gun was used in the commission of this offense, the trial court assumed the role of trier of fact and precluded the jury's independent consideration of whether the State had proved this element beyond a reasonable doubt. *See Neder v. United States*, 527 U. S. 1, 10, 119 S. Ct. 1827, 1834, 144 L. Ed. 2d 35 (1999); *Burrows*, 769 S.W.2d at 512. "The Fifth and Sixth Amendments to the United States Constitution 'require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.'" *Walker*, 29 S.W.3d at 893 (quoting *United States v. Gaudin*, 515 U.S. 506, 509, 115 S. Ct. 2310, 2313, 132 L. Ed. 2d 444 (1995)).

We conclude that the trial court erred by failing to provide the jury with a complete instruction as to the law of the offense of aggravated robbery. The next step is to determine whether this error requires reversal of Defendant's conviction for especially aggravated robbery. The omission of an essential element of an offense from a jury instruction is subject to harmless error analysis. *Garrison*, 40 S.W.3d at 434. Under this analysis, "where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless." *Neder*, 527 U.S. at 17, 119 S. Ct. at 1837; *State v. Allen*, 69 S.W.3d 181, 190 (Tenn. 2002).

The victim in this case testified that Defendant "had a gun on [him]," that Defendant "attacked [him] with a gun" and hit him in the head at least once with the hand that held the gun. Defendant did not question the perpetrator's use of a gun. The thrust of Defendant's cross-examination focused on the accuracy of the victim's identification of Defendant as the perpetrator. Broken pieces of a gun grip were found in the portion of the store where the sales counter was located. Although Defendant strenuously pressed the police officers about their failure to tie the gun to the perpetrator, Officer Kant testified that it was not possible to test the fragments for fingerprints because of the size and surface quality of the fragments. Defendant's trial strategy essentially conceded that a gun was used in the commission of the offense and the presence of a gun during the robbery was not contested. Based upon the evidence presented in this case and Defendant's theory of defense, we find that the trial court's error was harmless beyond a reasonable doubt. Defendant is not entitled to relief on this issue.

14

## V. Consecutive Sentencing

Defendant also challenges the trial court's order requiring him to serve his sentence for especially aggravated robbery consecutively to his sentence for attempt to commit first degree murder. Defendant contends that the evidence is insufficient to support the trial court's finding that he is a dangerous offender and argues that consecutive sentencing is neither justly deserved nor the least severe punishment. Defendant argues that his good behavior in jail during his trial and sentencing indicates a lack of violence and an amenability to rehabilitation. Defendant also contends that the fact that he left the victim alive and did not shoot him despite the possession of a gun contradicts the trial court's finding that Defendant showed little or no regard for human life or that the offense involved a high risk to life.

When a defendant appeals the manner of service of a sentence imposed by the trial court, this court conducts a *de novo* review of the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). The presumption of correctness is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The defendant has the burden of showing that the sentence is improper. Tenn. Code Ann. § 40-35-401(d), Sentencing Commission Comments. However, if the record shows that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the sentence is purely *de novo*. *Ashby*, 823 S.W.2d at 169.

When a Defendant is convicted of multiple crimes, the trial court, in its discretion, may order the sentences to run consecutively if it finds by a preponderance of the evidence that a defendant falls into one of seven categories listed in Tennessee Code Annotated section 40-35-115. In this instance, the trial court found that Defendant was "a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. §40-35-115(a)(4). However, if the trial court rests its determination of consecutive sentencing on this category, the court must make two additional findings. *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). First, the trial court must find that an extended sentence is necessary to protect the public from further criminal conduct by Defendant, and, second, it must find consecutive sentencing to be reasonably related to the severity of the offenses. *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995).

Although such specific factual findings are unnecessary for the other categories enumerated in Tennessee Code Annotated section 40-35-115(b), the imposition of consecutive sentences is also guided by the general sentencing principles that the length of a sentence be 'justly deserved in relation to the seriousness of the offense' and 'no greater than that deserved for the offense committed.'" *Imfeld*, 70 S.W.3d at 708 (quoting Tenn. Code Ann. §§ 40-35-102(1) and -103(2)); *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999).

The trial court found that the circumstances surround the commission of Defendant's offenses were extremely aggravated. The victim was unarmed and in no position to resist the

robbery, nor did he attempt to do so. Nonetheless, Defendant severely and ruthlessly beat the victim causing substantial injuries before dragging him into the bathroom and shutting the door. Although Defendant protests that he left the victim alive, the circumstances surrounding the offense do not preponderate against the trial court's finding that Defendant's behavior indicated little regard for human life and that he had no hesitancy about committing a crime where the risk to human life was high.

The trial court further found that the totality of the circumstances evidenced an offense of "absolute horror," and that Defendant's action in leaving the severely injured victim in the bathroom "to die," was totally unnecessary in order for Defendant to escape. Based on the viciousness of the offenses, the trial court found that consecutive sentencing was necessary to protect society and was reasonably related to the severity of the offenses.

We conclude that the trial court did not err in classifying Defendant as a dangerous offender and ordering Defendant to serve his sentences for attempt to commit first degree murder and especially aggravated robbery consecutively. Moreover, dangerous offender status notwithstanding, the record supports the imposition of consecutive sentencing based on Defendant's commission of the offense while on probation. Tenn. Code Ann. § 40-35-115(b)(6).

The record shows that Defendant was placed on probation in Arkansas in 1996 until May 20, 2001 following felony convictions of one count of theft of property over $500 and two counts of forgery. It is necessary to find the presence of only one of the statutory categories listed in Tennessee Code Annotated section 40-35-115(b) to support the imposition of consecutive sentencing. *See State v. Adams*, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997) (Extensive criminal history alone sufficient to support consecutive sentencing). Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review of the record, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE

16